Matter of Pletcher v New York State Gaming Commission
2026 NY Slip Op 02907
May 7, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

In the Matter of Todd A. Pletcher, Petitioner,
v
New York State Gaming Commission, Respondent.

Decided and Entered:May 7, 2026
CV-25-0353
Calendar Date: March 26, 2026
Before: Aarons, J.P., Pritzker, Reynolds Fitzgerald, Fisher And Mcshan, JJ.

Andrew J. Mollica, Garden City, for petitioner.
Letitia James, Attorney General, Albany (Jonathan D. Hitsous of counsel), for respondent.

[*1]
Pritzker, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Schenectady County) to review a determination of respondent, among other things, suspending petitioner's license to participate in thoroughbred racing for 10 days.
Forte, a thoroughbred racehorse trained by petitioner, placed first in the eleventh race at Saratoga Race Course on September 5, 2022. Postrace blood and urine samples taken from the horse were sent to the New York Drug Testing and Research Program and tested positive Meloxicam, a nonsteroidal anti-inflammatory drug (hereinafter NSAID). The blood sample contained a low level of Meloxicam and the urine sample contained an unspecified concentration. Petitioner sought testing of split-samples, which were sent to Texas A & M Veterinary Medical Diagnostic Laboratory. The results of that testing confirmed the presence of Meloxicam in the postrace samples of blood and urine.
Based upon the positive test, respondent, through the state steward, issued a notice to petitioner suspending him from participating in thoroughbred racing for 10 days and imposed a fine of $1,000. Respondent also issued a notice of violation to Michael Repole, Forte's owner, who together with petitioner filed an administrative appeal. Respondent issued a notice of joint hearing stating that, pursuant to 9 NYCRR 4043.2 (d), " 'Meloxicam' is not an NSAID authorized for use, in any amount, on Thoroughbred horses racing in New York." Over petitioner's objection, the Hearing Officer permitted the owner representative for the second-place finisher in the race precipitating the postrace testing to intervene in the hearing. Following the hearing, the Hearing Officer, based upon factual and legal findings, concluded that "the undisputed presence of Meloxicam in Forte following the 11th race . . . on September 5, 2022 violated 9 NYCRR [4043.2 (d)]" (italics omitted) and that petitioner was responsible for the positive drug test pursuant to 9 NYCRR 4043.4. As such, the Hearing Officer recommended that respondent uphold the penalties imposed by the state steward. Incident to the recommendation, the Hearing Officer succinctly and unambiguously interpreted 9 NYCRR 4043.2 (d), to wit; "[b]ased on a plain reading of [respondent's] rules and record evidence, I conclude that Meloxicam is prohibited from being administered to a horse within the seven-day racing window, and the presence of Meloxicam in Forte's post-race samples violated 9 NYCRR [4043.2 (d)]" (italics omitted; emphasis added). Respondent thereafter adopted the Hearing Officer's findings of fact and conclusions of law in toto and imposed the recommended penalties. Petitioner then commenced this CPLR article 78 proceeding challenging respondent's determination. In lieu of an answer, respondent moved to dismiss the petition on the ground that petitioner failed to join certain necessary parties. Supreme Court (Cuevas, J.) denied respondent's motion and transferred the proceeding [*2]to this Court pursuant to CPLR 7804 (g).
The primary issue in this appeal involves the interplay between 9 NYCRR 4043.2 (d) and (h) in the specific context of respondent's regulations as to the use of certain substances and medications in thoroughbred horse racing, and in the general context of respondent's regulations governing thoroughbred horse racing (see 9 NYCRR, ch I, subch A). More particularly, the question is whether it is rational for respondent to interpret 9 NYCRR 4043.2 (d) as being violated on the basis of a postrace test which is positive for Meloxicam, without the need for direct evidence that the Meloxicam was administered within the seven days before the race (see 9 NYCRR 4043.2 [h]). Petitioner contends that this interpretation is not rational and, as such, is not entitled to deference. To that end, "[t]he interpretation given to a regulation by the agency which promulgated it and is responsible for its administration is entitled to deference if that interpretation is not irrational or unreasonable" (Matter of 427 W. 51st St. Owners Corp. v Division of Hous. & Community Renewal, 3 NY3d 337, 342 [2004] [internal quotation marks and citations omitted]; accord Matter of Noda v New York State Gaming Commn., 233 AD3d 1123, 1125 [3d Dept 2024]).
As to the relevant regulations, 9 NYCRR 4043.2 begins with the overarching exclusionary provision that "[d]rugs and medications are permitted to be used only in accordance with the . . . provisions [of this section]." The various subsections then set forth the particular rules regarding medications, including how and when certain medications can be administered during the week prior to a race in which the horse will compete (see 9 NYCRR 4043.2 [a]-[k]). Relevant to this case, 9 NYCRR 4043.2 (d), which is also exclusionary, lists only three specific NSAIDs, any one of which may be administered until 48 hours before post time of a race in which the horse will compete. Meloxicam is not one of the three specific NSAIDs that are listed (see 9 NYCRR 4043.2 [d]). Also relevant to the arguments on appeal, 9 NYCRR 4043.2 (h), another exclusionary provision, provides that "[n]o other drugs or medications . . . may be administered by any means within one week of the scheduled post time of the race in which the horse is to compete."
We turn our attention first to 9 NYCRR 4043.2 (d), referred to throughout the administrative proceeding and on appeal as "the NSAID rule." At the administrative hearing, Scott Palmer, a veterinarian who serves as respondent's equine medical director, explained that over the last 10 years, there has been a "very strong push" for medication reform in horse racing and that the "general trend is to reduce the amount of medications given to a race horse in close proximity to the race." Palmer testified specifically about NSAIDs, explaining that they relieve inflammation, mask pain and can potentially allow a horse to perform better. Palmer also explained that changes were made in [*3]2020 to 9 NYCRR 4043.2 specific to the use of NSAIDs during the week before a race. 9 NYCRR 4043.2 (d) restricts the permissible NSAIDs to only three kinds, all of which are approved by the Food and Drug Administration (hereinafter FDA) for use in horses. Palmer testified that Meloxicam is not approved by the FDA for use in horses. Palmer also explained that the NSAIDs that were eliminated from the regulation "are not widely used," and, more importantly, do not have clear "appropriate lab threshold[s]" (emphasis added). Because the lab thresholds are unclear, it is difficult, if not impossible, to ascertain when Meloxicam was administered based solely on postrace testing. Conversely, the record contains evidence that the three specifically permitted NSAIDs would no longer be present in postrace samples if administered at least 48 hours before race time.FN1 Given this background, and under the facts of this case, it is rational for respondent to find that a postrace positive test for Meloxicam, in and of itself, constitutes substantial evidence of a violation of 9 NYCRR 4043.2 (d) without the need for direct proof that Meloxicam was administered within the seven-day period prior to the race. This result is not, as petitioner contends, irrational or unreasonable, nor does it render subsection (h) meaningless.
Indeed, respondent's interpretation is grounded in both policy and evidentiary standards. First, it is apparent that 9 NYCRR 4043.2 is part of a highly comprehensive regulatory framework that regulates thoroughbred horse racing. In this regard, as demonstrated by testimony at the administrative hearing, the overall purposes of the regulatory framework include the safety of the horses, parity among the competitors and fairness for the wagering public (see generally Matter of Casse v New York State Racing & Wagering Bd., 70 NY2d 589, 595-596 [1987]). Key to achieving these ends is a drug-free horse at race time (see generally id.). Additionally, as also demonstrated by the testimony, it is difficult, if not impossible, to determine the time of administration for some substances, such as Meloxicam, which makes enforcement of the regulations regarding some prohibited substances difficult (see generally id.). Certainly, the purpose of the regulatory scheme would not be advanced and, in fact, would be hindered by imposing an evidentiary standard which is nearly impossible to meet in some circumstances. Conversely, the three NSAIDS that are permitted in 9 NYCRR 4043.2 (d), if administered at least 48 hours prior to a race as stated in the regulation, would not be present in postrace testing. This allows for easy enforcement and advances the overall purpose of a drug-free horse on race day.
Moreover, although subdivision (h) specifically prohibits the administration of any other drugs during the seven-day window before a race, it does not provide that, outside of this seven-day window, any and all substances may be administered. Finally, as previously [*4]discussed, both 9 NYCRR 4043.2 as a whole and subsection (d) specifically are exclusionary. This interpretation does not write out (h), nor hold that there can never be a case where proof of the time of administration is necessary to establish a violation of 9 NYCRR 4043.2 (d). Rather, we are holding that, given the seven-day period set forth in subsection (h), it is rational to determine that respondent established a prima facie showing of a violation of 9 NYCRR 4043.2 (d) based upon the positive postrace test for Meloxicam, without requiring direct proof of administration within seven days of the race. Such proof then shifts the burden to petitioner under the trainer responsibility rule and affords the trainer the opportunity to demonstrate, by substantial evidence, accidental contamination or some other showing that negates his or her responsibility (see 9 NYCRR 4043.4; Matter of Casse v New York State Racing & Wagering Bd., 70 NY2d at 594-595).FN2
Petitioner also contends that this interpretation is arbitrary and must be annulled because it is inconsistent with previous legal rulings which "upheld convictions only where [respondent] was able to prove the drug at issue had been administered within the restricted time frame" (see e.g. Matter of Charles A. Field Delivery Serv. [Roberts], 66 NY2d 516 [1985]). We disagree. Petitioner cites to several cases, all of which are inapposite as none of them deal with agency decisions that found a violation of the NSAID rule set forth in 9 NYCRR 4043.2 (d). Specifically, the majority of the cited cases were charged under the catch-all provision of9 NYCRR 4043.2 (h), or its predecessors (see 9 NYCRR 4043.2 [former (e)]; [former (f)]), which specifically prohibits "administ[ration] . . . within one week of the scheduled post time of the race" (see e.g. Matter of Casse v New York State Racing & Wagering Bd., 70 NY2d at 592; Matter of Laterza v New York State Racing & Wagering Bd., 68 AD3d 1509, 1509 [3d Dept 2009]; Matter of Pletcher v New York State Racing & Wagering Bd., 35 AD3d 920, 920 [3d Dept 2006], lv denied 9 NY3d 802 [2007]; Matter of Dutrow v New York State Racing & Wagering Bd., 18 AD3d 947, 947 [3d Dept 2005]; Matter of Freed v New York State Racing & Wagering Bd., 9 AD3d 808, 808 [3d Dept 2004]; Matter of Zito v New York Racing & Wagering Bd., 300 AD2d 805, 805-806 [3d Dept 2002], lv denied 100 NY2d 502 [2003]). Based upon the wording of this subdivision, there would need to be proof of administration within the week before the race (see 9 NYCRR 4043.2 [h]). The remaining cases deal with substances which are specifically allowed to be administered within the week before a race, but only within a certain time frame (see e.g. Matter of Mosher v New York State Racing & Wagering Bd., 74 NY2d 688, 689 [1989]; Matter of Fusco v New York State Racing & Wagering Bd., 88 AD3d 1240, 1241 [3d Dept 2011], lv denied 18 NY3d 809 [2012]). These violations were based upon administration outside of the permissible [*5]time frame and, as such, required proof of when they were administered (see Matter of Mosher v New York State Racing & Wagering Bd., 74 NY2d at 690; Matter of Fusco v New York State Racing & Wagering Bd., 88 AD3d at 1241). None of these cases, however, deal with the situation here, a violation of 9 NYCRR 4043.2 (d) which allows only for the administration of one of three specific NSAIDs more than 48 hours before a race and thus, as respondent interprets, does not allow for the administration of any other NSAIDs the week before the race. Accordingly, petitioner has not pointed us to any decision, of this or any other court, in which a court examined a decision by respondent regarding the NSAID rule that, "on essentially the same facts as underlaid a prior agency determination, reaches a conclusion contrary to the prior determination" (Matter of Charles A. Field Delivery Serv. [Roberts], 66 NY2d at 518), which is not surprising, as this is a case of first impression.
Bearing this in mind, petitioner further asserts that respondent did not demonstrate, by substantial evidence, a violation of 9 NYCRR 4043.2 (d). "[This Court] review[s] an administrative determination issued after a legally mandated evidentiary hearing for substantial evidence. The standard is a minimal one and is met by such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (Matter of Noda v New York State Gaming Commn., 233 AD3d at 1123-1124 [internal quotation marks and citations omitted]; see Matter of Rice v New York State Gaming Commn., 217 AD3d 1098, 1101-1102 [3d Dept 2023]).
At the commencement of the hearing, several stipulations were entered. One such stipulation was, in sum and substance, that, at petitioner's request, Forte's blood and urine samples from September 5, 2022 were tested by the Texas A & M Veterinary Medical Diagnostic Laboratory, which found Meloxicam in both of the samples. Additionally, Palmer testified regarding respondent's exhibit 6, the laboratory report of analytical findings, signed by George Maylin, the director of the New York Drug Testing and Research Lab, which reported that Forte's postrace blood and urine samples contained Meloxicam. This report was admitted into evidence, over petitioner's objection. Palmer further testified that, at petitioner's request, a Texas laboratory also tested Forte's samples. The report from that laboratory, which was admitted as respondent's exhibit 5, detailed that low levels of Meloxicam were detected in Forte's postrace blood and urine samples.
For his part, petitioner testified that, after receiving notification of Forte's positive test result, he investigated and confirmed there was no Meloxicam in the barn and that no one who worked in the barn was taking Meloxicam or treating a pet with it. Petitioner also testified that in the summer of 2022, Vincent Viola, Forte's co-owner, visited the barn after taking Meloxicam and was present with Forte in the winner's circle [*6]after the September 5, 2022 race. In an affidavit received in evidence, Viola attested that, in the summer of 2022, he frequently physically interacted with Forte while he was taking Meloxicam, which he had been prescribed for back pain. He further averred that he was present in the paddocks before the race on September 5, 2022, walked Forte into the winner's circle and gave the horse a congratulatory kiss on the head. Petitioner also called three veterinarians who treated Forte during the relevant time period, each of whom denied having prescribed or administered Meloxicam to the horse. Maylin also testified on petitioner's behalf and explained that it was possible that Meloxicam was present because of environmental contamination or from administration of the drug. On cross-examination by the intervenor, Maylin confirmed that it would be "highly unlikely, if not scientifically impossible, for a single occasion, through no mucosa, no injection, just touching the hide of a horse or leading a horse to lead to a positive [test result]." Finally, petitioner called Steven Barker, an expert in physiology, pharmacology, toxicology and analytical chemistry, who testified that the Meloxicam in Forte's samples, based upon the ratios in the blood and urine, "appears to have been given or not given, in contact with the horse very close to the race. So, you know, somewhere in . . . the paddock, somewhere during [or] after the race, maybe even in the test barn, and maybe the people there."
Based on the foregoing, respondent's determination is supported by substantial evidence. Initially, given that the test results from the laboratory in Texas, which the parties stipulated to coming into evidence, were positive for Meloxicam in Forte's postrace samples of blood and urine,FN3 a violation of 9 NYCRR 4043.2 (d) was established by substantial evidence (see generally Matter of Dutrow v New York State Racing & Wagering Bd., 97 AD3d at 1036; Matter of Fusco v New York State Racing & Wagering Bd., 88 AD3d at 1241-1242).FN4 Moreover, 9 NYCRR 4043.4 (a) creates a rebuttable presumption, which petitioner failed to rebut by substantial evidence (see Matter of Casse v New York State Racing & Wagering Bd., 70 NY2d at 594-595; Matter of Pletcher v New York State Racing & Wagering Bd., 35 AD3d at 922). Although petitioner's witnesses offered alternative explanations for this positive finding, these explanations were mere speculation, which does not rebut the presumption of Pletcher's responsibility (see Matter of Guarino v New York State Racing & Wagering Bd., 45 AD3d 1096, 1097 [3d Dept 2007], lv denied 10 NY3d 730 [2008]; Matter of Zito v New York State Racing & Wagering Bd., 300 AD2d at 807).
Petitioner also argues that his due process rights were violated because respondent, ex parte, invited the intervenor and his out-of-state attorney who lacked pro hac vice status to act as "co-prosecutors" at the hearing. " 'Generally, allowance or denial of applications to intervene in [*7]administrative proceedings rests in the discretion of the agency' " (Matter of Cortland Glass Co. v Angello, 300 AD2d 891, 892 [3d Dept 2002] [citation and footnote omitted], quoting Matter of Village of Pleasantville v Lisa's Cocktail Lounge, 33 NY2d 618, 619 [1973]). Initially, petitioner's challenge to the intervenor's counsel's pro hac vice status is unpreserved because petitioner did not object to counsel's participation on that ground (see generally Matter of Daniels v Venettozzi, 219 AD3d 1000, 1001 [3d Dept 2023]; Matter of DeBonis v Corbisiero, 169 AD2d 390, 390-391 [1st Dept 1991], lv denied 78 NY2d 852 [1991]). Having reviewed the record of the administrative hearing, we are unpersuaded that petitioner's due process rights were violated. Petitioner was put on notice that intervenors would be allowed, and had the opportunity to object to same once the intervenor's attorney provided notice that he would be appearing. Though, ultimately, petitioner's objections were denied by the Hearing Officer, we do not find this to be an abuse of discretion (see generally Matter of Cortland Glass Co. v Angello, 300 AD2d at 893). Moreover, although petitioner asserts that the intervenor and his attorney acted as "co-prosecutors" at the hearing, petitioner fails to identify, and the transcript does not reveal, how the intervenor acted as a "co-prosecutor[ ]." In fact, the intervenor argued that, although Forte should be disqualified on the basis of the positive test result, he also argued that petitioner should not be disciplined given his proffered mitigating evidence. Accordingly, petitioner's contentions that he did not receive a fair hearing are without merit. Petitioner's remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.
Aarons, J.P., Reynolds Fitzgerald, Fisher and McShan, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.

Footnotes

Footnote 1
Palmer testified that although Meloxicam is not approved by the FDA for use in horses, the Animal Medicinal Drug Use Clarification Act of 1994 does allow for the use of non-FDA-approved substances in certain limited circumstances pursuant to a valid veterinarian/client/patient relationship. Such a situation is not relevant here as petitioner's witnesses denied prescribing or administering Meloxicam prior to the race.

Footnote 2
Petitioner's further argument, that the NSAID rule is invalid because it violates the State Administrative Procedure Act, is unpreserved as it is being raised for the first time before this Court (see Meadow E. Assoc. LP v Village of Potsdam, 211 AD3d 1373, 1378 [3d Dept 2022]; Matter of Martinez v State Univ. of N.Y., 294 AD2d 650, 651 [3d Dept 2002]).

Footnote 3
We need not reach petitioner's arguments regarding the alleged erroneous admission of Maylin's letter — which set forth the original positive test result — given the stipulation as to the positive test results from the Texas laboratory (compare Pletcher v New York State Gaming Commn., 247 AD3d 1342, 1343 [3d Dept 2026]). Moreover, given that, here, the violation of 9 NYCRR 4043.2 (d) is not tied to a specific threshold of an NSAID (compare 9 NYCRR 4043.3 [a] [26]), but rather to the presence of the NSAID alone, this case does not present the same evidentiary concerns as were present in Pletcher v New York State Gaming Commn. (247 AD3d at 1345).

Footnote 4
Petitioner's contentions relative to the reliability of the testing method and equipment is unpreserved as there was no testimony regarding same at the hearing (see Pletcher v New York State Gaming Commn., 247 AD3d at 1344; cf. Brown v Venettozzi, 164 AD3d 1583, 1584 [3d Dept 2018], lv denied 33 NY3d 905 [2019]).